369 A.2d 1224

**COMMONWEALTH of Pennsylvania**

v.

**James E. FRAZIER, Jr., Appellant.**

Supreme Court of Pennsylvania.

Argued Nov. 20, 1975.

Decided Feb. 28, 1977.

———◆———

Allen H. Krause, Lebanon, John E. Feather, Jr., Annville, for appellant.

George E. Christianson, Dist. Atty., David Brightbill, Lebanon, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

MANDERINO, Justice.

At approximately 8:00 a. m., Friday, November 9, 1973, Jennifer Gross, a sixth grade student and safety patrol member from Lebanon, Pennsylvania, left her home and headed for her safety patrol station a short distance away. She reached neither her station nor the school. Later that day, in a wooded area north of Lebanon, fire fighters engaged in extinguishing a brush fire discovered her body, partially covered with debris, lying on a small trash dump. Death was caused by multiple stab wounds to the neck, and inhalation of fumes from the fire.

The next day, police were told by two men, who had been in the vicinity of the victim's route to her patrol station on the previous morning, that at approximately 8:00 a. m., they had heard a girl screaming, and saw a child and an adult scuffling. They testified that the child was forced into a black Buick automobile. The witnesses moved closer, ascertained that the adult was "short and stocky," and recorded the license number of the automobile, OC3181.

Police investigation revealed that appellant owned a black Buick automobile, that his build was short and stocky, and that the license number of appellant's car was O3C181, the same as the number earlier recorded except that the order of the number "3" and the letter "C" were reversed. The two witnesses to the scuffle were shown appellant's car; they stated they believed it was the same car into which the child had been forced the day before.

From this information, three search warrants were issued: one for appellant's car, one for appellant's person and clothing, and one for appellant's residence.

At 10:15 p. m., Saturday, November 10, 1973, twelve to fifteen police, armed with the search warrants, proceeded to appellant's home. He was found next door at a neighbor's house, and was escorted back to his own home. The neighbor and close friend, who was also a guard at the Lebanon County Prison, accompanied appellant and the police to appellant's home. Appellant's *Miranda* rights were read to him by the police, he indicated understanding, and asked his friend what to do. The friend told appellant to tell the truth. Appellant initially denied any part in the homicide. When another policeman entered the room where appellant was seated, carrying pants apparently stained with blood however, appellant made certain incriminating statements. Immediately thereafter, at 11:40 p. m., appellant was taken to the district attorney's office and, again, *Miranda* warnings were read to him. At this point appellant requested an attorney, and all further questioning ceased.

Appellant was tried and convicted by a jury of murder in the first degree on March 20, 1974, and on November 6, 1974, was sentenced to life imprisonment. Post-verdict motions were denied, and this appeal followed.

Appellant's appeal rests on five contentions: he first argues that the trial court erred in denying his request for a change of venue on the basis of inflammatory pre-

trial publicity; secondly, he argues that the trial court erred in denying his request to suppress evidence obtained through search warrants allegedly issued without probable cause; thirdly, he contends that the trial court erred in denying his request to suppress certain statements made by him because these statements were given to police involuntarily, having been obtained through fraud and trickery; fourthly, he argues that the trial court erred in permitting two of appellant's friends to testify as to certain conversations they had with him after the murder and before his arrest; and lastly, appellant argues that the trial court erred in refusing appellant's motion for a mistrial based on the allegedly emotional conduct of the victim's family during the trial. We agree with appellant's contention that the trial court abused its discretion in refusing to grant appellant's request for a change of venue. We therefore reverse the judgment of sentence and remand the matter for further proceedings consistent with this opinion. In light of this disposition, we will not now discuss the other issues raised.

The Jennifer Gross homicide occurred in Lebanon County, a largely rural area with a population, according to the latest census, of approximately 100,000. From the moment the news of the homicide became public, the community was emotionally stirred. The story aroused the interests of virtually all citizens of the community. The victim's body was discovered on Friday, November 9, 1973. That discovery was reported by the local newspapers in their headlines the following day. On Monday, November 12, 1973, the Lebanon Daily News, in bold, red print headlines measuring over one-half inch in height, and extending the entire width of the first page, announced: "Arrest Suspect In Murder Of Girl." Immediately beneath these headlines, in three-eighths inch high type, two columns wide, the subheadline stated: "Jail Former Penitentiary Prisoner, 26." Accompanying these headlines was a large photograph of appellant.

The companion story related that appellant had previously been tried and convicted on a morals charge and had spent two and one-half years at Rockview State Penitentiary from which he had been released just two months prior to the homicide. In addition, the report indicated that appellant had spent approximately eighteen months at another state institution. The article also stated that a member of appellant's own family described him as "mentally ill."

Appellant was afforded a preliminary hearing on Monday, November 19, 1973. On the following day, Tuesday, November 20, 1973, the Lebanon Daily News, again in a front-page story, recited some of the key testimony produced at that hearing, including admissions made by appellant during his interrogation by police. This story, consisting of a large photograph of appellant leaving the County Jail to attend his hearing, a three column wide headline stating "Frazier Held For Murder Following His Hearing," and text occupied almost one-third of the total front page. The text of the report began,

> "James E. Frazier, Jr., went Christmas shopping after he allegedly murdered an 11-year-old school girl the morning of November 9, a district magistrate was told here Monday afternoon.

> [This] comment concerning the shopping trip was made by State Police Sgt. Elwood Krause, one of three Commonwealth witnesses . . . ."

Later, this article quoted Sergeant Krause as saying that he asked appellant if he had planned the murder and of receiving the answer: "No, it was just something that happened." The article continued,

> "Sgt. Krause said he then asked, 'Did you stab her with a knife?' To which Frazier replied, 'No, I used a piece of glass.'

> .    .    .    .    .    .    .    .

> Another question which Sgt. Krause said he asked Frazier concerned the place where the child's death

occurred. 'I asked him if it happened in the car or the woods and he said in the woods,' the policeman related."

On Wednesday, November 21, 1973, and on Friday, November 23, 1973, in the "Public Forum" section of the Lebanon Daily News, letters to the editor concerning the offense for which appellant was charged were printed. One of the letters was entitled "Death to Child Killers." That letter, calling for the appellant's death, also complained that he had been previously jailed on morals charges involving youths, and was now paroled. The other letter complained that the photograph published on Tuesday, November 20, (and referred to above as showing appellant leaving the County Jail), showed that appellant was not handcuffed:

" '. . . is the murder suspect being escorted from the Municipal Building without being handcuffed to an officer, or are my eyes deceiving me? There is no further comment necessary on the nature of the alleged crime, but as a parent, I cannot begin to believe what I saw in that picture.'

(Editor's Note: You are right. There were no handcuffs.)"

According to the record, the Lebanon Daily News is delivered to approximately 30,000 homes in Lebanon County daily. The total number of households in Lebanon County as of 1970 was 31,074. It is thus clear that the articles published in the Lebanon Daily News reached nearly every household in the county, exposing practically every potential juror to the above news coverage. Furthermore, the fact that in 1973 there were only two homicides reported in Lebanon County (Pennsylvania State Police, "Crime in Pennsylvania, Uniform Crime Report"), served to intensify the already highly emotional public reaction to the killing of a young girl.

In *Commonwealth v. Price*, 463 Pa. 200, 344 A.2d 493 (1975), and in *Commonwealth v. Harkins*, 459 Pa. 196,

328 A.2d 156 (1974), we reversed and remanded for new trials having concluded such a result was required in each case because of the potential for prejudice which resulted from the jurors' exposure to evidence outside the judicial process. As we said in *Harkins*, due process considerations require that an accused be afforded a fair trial "by a panel of impartial and 'indifferent' jurors." We continued, saying:

"Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula." *United States v. Wood,* 299 U.S. 123, 145–146, 57 S.Ct. 177, 185, 81 L.Ed. 78, 88 (1936). 'The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.' *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907)."

*Id.* at 199, 328 A.2d at 157.

In *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973), *cert. denied,* 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed. 2d 124 (1973), we held that there can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice. *See also Commonwealth v. Brado,* 470 Pa. 306, 368 A.2d 643 (1977). In *Pierce,* we found that the pretrial publicity itself constituted a denial of due process; the denial of due process was *inherent in the publicity.* The nature of the pretrial publicity in *Pierce* was summarized as follows:

"Because of the nature of the crimes and the fact that one of the victims was a seminarian and the other a practicing lawyer in Delaware County, *the incident*

*received wide coverage* in the newspapers, and on radio
and television. While much of the publicity was rou-
tine, factual, and wholly lacking in inflammatory con-
tent, a great deal of publicity about Pierce was *emo-
tionally charged and inflammatory, and clearly pointed
to his guilt.* A brief review of some of the inflamma-
tory news coverage will show the quality of the public-
ity. In one story the police were quoted as stating
Pierce had been arrested, and he verbally confessed to
the double shooting. The story read: '[Police] He's
the triggerman . . . He admitted he did it and
now he's crying and weeping.' The story went on to
state: 'Police said Pierce's record dates to 1963 and in-
cludes arrests for car theft, assault and battery and
carrying a concealed deadly weapon . . . He re-
portedly served time in the state juvenile center in
Dallas, Pa.' Another story was entitled, 'Two Youths
Re-enact Media Street Attack.' This story reported a
staged re-enactment of the crime and read: 'Speaking
softly, Pierce who Police say has confessed to being
the "triggerman" described how the three youths en-
countered the victims and then indicated where the
victims fell after the attack.' Accompanying this story
was a large picture of Pierce flanked by a policeman
with a caption which read: 'Alan Pierce indicates for
C. I. D. Detective Edward Smith where one of the vic-
tims fell.' Another article was titled, 'Third Youth
Held in Media, Chester Man, 20 Admits Being Gunman,
Chief says.' " (Emphasis added.)

*Id.* at 192–93, 303 A.2d at 211.

On the basis of this evidence we concluded that the
publicity was so pervasive and inflammatory that this
Court would assume that the jury had been biased. See
also ABA Project on Minimum Standards for Criminal
Justice, Standards Relating to Fair Trial and Free Press,
Section 342(c) (1956). For this reason we reversed and

remanded the trial court's refusal to grant the requested change of venue in *Pierce.*

In *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976), on the other hand, we affirmed the trial court's denial of a motion for change of venue. In *Kichline, supra,* although we acknowledged that pretrial publicity of appellant's alleged confession and of his prior criminal offenses was prejudicial, we concluded that in the circumstances of that case the publicity was not so "inherently prejudicial" as to deny appellant a fair trial. In so concluding we noted that several distinctions existed between *Pierce* and *Kichline.* In *Pierce,* we summarized the pretrial publicity as "emotionally charged and inflammatory," and "excessive." In *Kichline,* however, we concluded that the pretrial publicity was neither inflammatory or excessive, and that furthermore, a "lengthy delay" of six months between the complaint of publicity and the trial, "was [sufficient] time for the effect of these news articles to fade from the minds of prospective jurors." In *Pierce,* the period of time elapsing between the occurrence of the complained of publicity and the trial was more than nine months.

The pretrial publicity in the instant case immediately and directly implicated appellant as the confessed killer of a young local girl. Additionally, his past criminal record became a subject of public knowledge. Here, as in *Price, Harkins,* and *Pierce,* appellant's right to be tried by an impartial jury, as guaranteed by the Sixth Amendment to the United States Constitution and by Article I, Section 9 of the Constitution of this Commonwealth, was violated because the nature of the pretrial publicity was such that one exposed to it would be unable to serve as an impartial juror, and because the extent of that pretrial publicity was such that virtually every prospective juror in the county was exposed to it.

The news articles at issue here, while not of the excessively emotional type dealt with in *Pierce,* nevertheless

exposed potential jurors first to appellant's prior criminal record, and second, to statements made by him admitting that he committed the killing. In the past, we have not hesitated to order new trials in cases where the jury was told, without proper safeguards, of an accused's prior criminal record. *See Commonwealth v. Allen,* 448 Pa. 177, 292 A.2d 373 (1972); *see also Commonwealth v. Fortune,* 464 Pa. 367, 346 A.2d 783 (1975), and cases cited therein. The danger of allowing the jury to know of such facts is obvious and need not be repeated here. *See Commonwealth v. Burdell,* 380 Pa. 43, 110 A. 2d 193 (1955). Furthermore, we have built an elaborate system of pretrial procedures to assure that a jury is not exposed to an accused's confession unless strict safeguards are complied with to assure that the confession has been knowingly, intelligently, and voluntarily tendered. *See Jackson v. Denno,* 378 U.S. 368, 12 L.Ed.2d 908, 84 S.Ct. 1774 (1964); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 239 A.2d 426 (1968), and that all other rules established by this Court concerning the admissibility of confessions, have been observed. *See, e. g., Commonwealth v. Futch,* 447 Pa. 389, 290 A.2d 417 (1972).

Of the thirty-five prospective jurors interviewed during the voir dire examination in the present case, thirty-two were asked if they recalled hearing or reading of the homicide for which appellant was now on trial. The other three were dismissed for cause on grounds that they were acquainted with one or more of the attorneys or prosecuting officers involved in the case. The *voir dire* interview examination occurred less than four months after the homicide. Of the thirty-two who were asked about their recollections, twenty-eight stated that they recalled hearing or reading of the murder. Of the fourteen jurors who were eventually seated (twelve jurors plus two alternates) eleven recalled having heard or read of the murder, two had no recollection, and only one stat-

ed that he had not read of the incident at issue. The defendant was granted eleven challenges for cause, the majority of these challenges being granted because the prospective juror involved stated that he or she had either formed a fixed opinion of appellant's guilt based on recollection of the newspaper articles—an opinion which could not be put aside—or because the prospective juror stated that he or she *specifically* recalled having read newspaper articles of appellant's prior criminal record. Five of appellant's challenges for cause (based on a juror's statement that he or she had formed an opinion as to defendant's guilt as a result of recollection of the newspaper articles) were refused by the trial court, and appellant was required to use peremptory challenges to keep those prospective jurors from being seated. Examination of the *voir dire* interviews thus clearly indicates that the news coverage which occurred at the time of and shortly after the homicide was still in the minds of the prospective jurors at the time of trial. The potential of prejudice resulting from the close proximity of such news articles publicizing appellant's prior criminal record, and his admissions of guilt, was therefore extremely great. This potential for prejudice exists despite the statements by the prospective jurors that they could put aside any opinion as to appellant's guilt which they had formed after reading the newspaper articles. *Commonwealth v. Price, supra; Commonwealth v. Harkins, supra.*

*Pierce* and *Kichline* illustrate the proper examination to be made by the trial court faced with a request for a change of venue charging that pretrial publicity will deny the accused's right to be tried by an impartial jury, is to first look at the *nature of the content* of the publicity. Does it contain references to the accused's prior record of criminal convictions, if any? Does it expose potential jurors to any confessions or admissions of guilt allegedly made by the accused? Does it point to the ac-

cused's guilt in terms that go beyond objective news reporting and enter the realm of the emotional and of the inflammatory? If the court answers any of these questions in the affirmative, its analysis must proceed to a determination of the likelihood that a significant number of the prospective jurors in the county were, in fact, exposed to such publicity. If the trial court answers "yes" to any of the above three questions concerning the content of the pretrial publicity, and if the record shows that there is a likelihood that a significant portion of the population was exposed to publicity of that nature, refusal to grant a change of venue would be an abuse of discretion unless the record also indicates that a sufficiently long period of time has passed between the time of the publicity and the time of the application for a change of venue for the court to conclude that any prejudice which may have been initially created by the publicity has been dissipated.

In *Pierce*, we concluded that the content of the pretrial publicity was of an extremely emotional and inflammatory nature, *and* that the frequency of the repeated news articles, combined with the pervasiveness of the coverage throughout the county, in the newspapers and on radio and television, was such as to create a likelihood that a significant percentage of potential jurors had been exposed to it. Therefore, we concluded that the accused need not specifically demonstrate a nexus between the pretrial publicity and those jurors actually interviewed. Nothing in *Pierce* indicated that the prejudice created by this publicity had dissipated by the time the application for change of venue was presented.

In *Kichline*, on the other hand, we concluded that the refusal to grant the requested change of venue was not an abuse of discretion even though the pretrial publicity contained references both to appellant's prior criminal record and to admissions of guilt he allegedly made to police, because the record contained sufficient evidence

for us to conclude that in the six months between the time of the initial publicity and trial, the effect of the news stories had faded from the prospective jurors' minds.

In the instant case, examination of the pretrial publicity reveals the existence of references to appellant's prior criminal record, and also contains quotations of admissions of guilt allegedly made by him to police. Furthermore, the record shows that these news stories reached the homes of practically every potential juror in the county. Furthermore, the record fails to demonstrate that the effect created by this publicity had faded from the minds of the prospective jurors in the four months intervening between the time of the homicide and the trial. In fact, the record shows that a high proportion of the prospective jurors interviewed during the *voir dire* remembered reading such articles. The potential for prejudice created by such publicity therefore remained great at the time the request for change of venue was made, and the trial court abused its discretion in refusing that request.

Judgment of sentence reversed and a new trial granted.

JONES, C. J., did not participate in the consideration or decision of this case.

O'BRIEN, J., concurs in the result.

NIX, J., filed a dissenting opinion.

NIX, Justice, dissenting.

The majority today has sub silentio departed from the clear precedent in this area and reverses the judgment of sentence for a trial ruling that was unquestionably in accord with the prevailing law at the time it was made. In reaching its result, which grants a new trial to appellant,

the majority ignored the dastardly nature of the crime [1] and disregarded the overwhelming evidence of appellant's guilt. I therefore am compelled to register my dissent.

I am well aware that due process mandates a fair trial regardless of the malevolence of the crime or the strength of the case against the accused. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). However, the due process clause, applicable to the States through the Fourteenth Amendment, does not require the result reached today. The United States Supreme Court has stated that a claimed violation of the right to a fair trial because of allegedly prejudicial pre-trial publicity can be sustained only where there is a showing of actual prejudice to a degree that rendered a fair trial impossible or where the coverage is so "inherently prejudicial" that prejudice will be presumed. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). In discussing those instances where prejudice will be presumed, the Court exercised great care in attempting to prevent this category from being expanded beyond those instances where the pre-trial media coverage was so extensive, so sustained, so pervasive and included highly inflammatory and prejudicial information that a climate had been created (and an insufficient time had elapsed for the taint to have dissipated) [2] in which a fair trial was impossible. *Murphy v. Florida, supra; Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). [3]

1. The victim was an 11-year-old girl, who left her home on the morning in question to report for her duties as a member of the school's safety patrol. She was a student at Garfield School, Lebanon County, a school for children who cannot compete in the normal school situation. Her mutilated body was subsequently discovered and it was ascertained that death had been caused by multiple wounds and the inhalation of fumes.

2. The bulk of the publicity appeared at the time of the arrest and the selection process commenced approximately four months later.

3. The Supreme Court has also presumed prejudice in instances where, in addition to the inflammatory pre-trial publicity, the dig-

The majority predicated its holding on the grounds that the record before us reflected facts that would justify a finding that the prejudice should be presumed, notwithstanding the concession that the instant news articles were not of the "excessively emotional type." The majority also ignored the fact that only 32 veniremen were required to be called to complete the selection of the first 12 jurors. The entire selection process (including the selection of two alternates) consumed only three hours. Of the panel questioned, 11 were excused for cause and only six were peremptorily challenged by the defense.[4]

It is equally clear that this record fails to establish from the totality of the circumstances that appellant's trial was not fundamentally fair. At most the record shows that members of the panel, from which the jury was selected, were exposed to articles that referred to appellant's prior criminal record and admission of guilt.[5]

nity and the objectivity of the trial has been disrupted "to accommodate the public appetite for carnival." *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036. *See also Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). There is no suggestion in this record that the decorum of the courtroom during the trial was in any way disturbed.

4. It is significant to note that although appellant is challenging the denial of the request to change venue, he has not raised an objection in this appeal to the failure of the court to grant his challenge for cause. It is also of importance to recognize that in *Irvin v. Dowd, supra,* where the Supreme Court felt relief should be given, the Court was there concerned with instances where the accused had also challenged the jurors for cause, but were forced to accept them because they had exhausted their peremptory challenges and possessed no other means to remedy their complaint. See also, *Rideau v. Louisiana, supra.* It is difficult to understand how a party can object to the acceptance of a juror where that party possessed peremptory challenges and failed to exercise them. Cf., *Commonwealth v. Shadduck,* 168 Pa.Super. 376, 77 A.2d 673 (1951).
*Commonwealth v. Hoss,* 469 Pa. 195, 203–204, 364 A.2d 1335, 1339–40 (1976).

5. Any harm that may have been created by the inclusion of appellant's admission of guilt in the pre-trial news coverage was de minimis under the facts of this case. The statements in the press

The United States Supreme Court in *Murphy v. Florida,
supra,* observed:

> The constitutional standard of fairness requires that
> a defendant have "a panel of impartial, 'indifferent'
> jurors." *Irvin v. Dowd,* 366 U.S. at 722, 81 S.Ct.
> 1639, 6 L.Ed.2d 751. Qualified jurors need not, how-
> ever, be totally ignorant of the facts and issues in-
> volved.
>
> > "To hold that the mere existence of any precon-
> > ceived notion as to the guilt or innocence of an ac-
> > cused, without more, is sufficient to rebut the pre-
> > sumption of a prospective juror's impartiality would
> > be to establish an impossible standard. It is suffi-
> > cient if the juror can lay aside his impression or
> > opinion and render a verdict based on the evidence
> > presented in court." Id., at 723, 81 S.Ct. 1639, 6 L.
> > Ed.2d 751.
>
> At the same time, the juror's assurances that he is
> equal to this task cannot be dispositive of the accused's
> rights, and it remains open to the defendant to demon-
> strate "the actual existence of such an opinion in the
> mind of the juror as will raise the presumption of par-
> tiality." Ibid.

which concerned the admission were derived from the testimony
offered by the Commonwealth during the preliminary hearing.
The news coverage of the preliminary hearing was primarily fac-
tual in nature, and there was no attempt to distort or to empha-
size the alleged admission. Further, precisely the same informa-
tion was presented to the jury at trial. The situation here is thus
inapposite to that presented in *Marshall v. United States,* 360 U.
S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). In that case, the Su-
preme Court set aside a conviction where the jurors were ex-
posed through news accounts to information that was *not* admit-
ted at trial.

While we recognize that the disclosure of information which is
admissible at trial may nevertheless be prejudicial where that dis-
closure is made in a setting where the safeguards of the trial are
not available, *Sheppard v. Maxwell, supra,* 384 U.S. at 351, 86 S.
Ct. 1507, such was not the case here. As stated above, the infor-
mation related through the media was simply a repetition of that
which was offered at trial.

[1b]  The voir dire in this case indicates no such hostility to petitioner by the jurors who served in his trial as to suggest a partiality that could not be laid aside. Some of the jurors had a vague recollection of the robbery with which petitioner was charged and each had some knowledge of petitioner's past crimes, . . . *Id.* 421 U.S. at 799–800, 95 S.Ct. at 2036 (footnote omitted).

Further, the *Murphy* Court distinguished between the rule prescribed by them for the Federal System in *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L. Ed.2d 1250 (1959) and the constitutional requirements which are binding upon the States. *Murphy v. Florida, supra* 421 U.S. at 797–98, 95 S.Ct. 2031. Although *Marshall*, held that persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced, the *Murphy* Court made it clear that this restriction represented an exercise of its supervisory powers and was not applicable to the States. The constitutional standard remains whether the defendant was tried by a panel of impartial, indifferent jurors. In the instant case the jurors testified as to their ability to put aside any opinion as to appellant's guilt, which may have been formed as a result of the pretrial exposure and render a verdict based solely on the evidence. There is nothing in the entire voir dire transcript that would reasonably cause one to question their sincerity or their capacity to decide the cause impartially. Hence, there is no foundation to support a claim for a violation of due process under the Federal Constitution.

Turning to State law it is equally clear that the trial court's denial of the request to change venue was not violative of Article I, Section 9 of the Pennsylvania Constitution, or contrary to prior case law. It is now well settled in this Commonwealth "that the accused who claims that the denial of a request for a change of venue has denied him his right of a fair trial must demonstrate the

prejudice that has been created by the failure to grant that request." *Commonwealth v. Hoss,* 469 Pa. 195, 201, 364 A.2d 1335, 1338 (1976). *See also, Commonwealth v. Pierce,* 451 Pa. 190, 195, 303 A.2d 209, 212 (1973). This requirement of showing an identifiable prejudice is relieved only in extreme situations. For the most part out decisions have followed federal guidelines in determining situations where prejudice may appropriately be presumed.[6] *See, Commonwealth v. Hoss, supra; Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Pierce, supra.*

In an effort to support its position the majority attempts to find a parallel between the instant factual situation and that presented in *Pierce.* Even a cursory consideration of the two cases forces the conclusion that the two matters are not comparable. In *Pierce* the Court was concerned not only with the presence of inherently prejudicial publicity but more importantly the source of that publicity. A close analysis of *Pierce* reveals that the determinative factor in the decision was the participation of the police and prosecutor in the dissemination of the inflammatory and prejudicial publicity. In the instant case the police and the prosecutor in no way contributed to the information appearing in the pre-trial articles. The record conclusively establishes that the contents of the articles were based on the independent research of representatives of the news media, press coverage of the preliminary hearing, and information supplied by members of appellant's family.

Another crucial distinction between the two cases concerns the nature, quality and extent of the pre-trial news coverage. In *Pierce* there was, in addition to the reporting by the printed media, extensive radio and television coverage of the incident and the subsequent arrest of the

6. The majority attempts to base its decision upon the theory of presumed prejudice. This tact was obviously motivated by its recognition that the record fails to support a finding of actual prejudice.

defendant. We noted that "a great deal of publicity about Pierce was emotionally charged and inflammatory, and clearly pointed to his guilt." 451 Pa. at 192, 303 A. 2d at 211. Typical of the suggestive nature of the reporting in *Pierce* was an article entitled, "Two Youths Re-enact Media Street Attack," which included a large photograph of the defendant at the scene of the crime, in the custody of police, "pointing" to where the victims' bodies fell. In contrast, the nature of the publicity in the instant case is not so emotional or suggestive as to be comparable to that in *Pierce,* and it thus falls far short of being "inherently prejudicial." It clearly defies reason to "presume", on the basis of the record before us, that the jury was biased.

In my judgment, the pre-trial news coverage in this case was even *less* pervasive, *less* inflammatory and therefore *less* prejudicial than that discussed by this Court in *Commonwealth v. Kichline, supra; Commonwealth v. Hoss, supra; Commonwealth v. Powell,* 459 Pa. 253, 328 A.2d 507 (1974) ; and *Commonwealth v. Martinolich,* 456 Pa. 136, 318 A.2d 680, *appeal dismissed,* 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974). In each of these cases we upheld the trial court's refusal to grant a change of venue because we could not conclude that the publicity was so inherently prejudicial as to deny the appellant a fair trial. In view of such consistent and long-standing precedent, I find the majority's determination that the instant publicity was presumptively prejudicial to be inexplicable.

Finally, it is apparent that the majority is attempting by its holding to adopt the *Marshall* rule of the Federal System for this Commonwealth. Assuming there may be some merit in embracing a per se rule that persons who have learned from news sources of a defendant's prior criminal activity should be presumed to be prejudiced, the result should not be accomplished by applying it to a court ruling denying a requested change of venue that

140

was made prior to the announcement of the new principle. In my judgment, in the event such a practice is to be embraced, it should be accomplished either by rule or in a decision where its application is made prospective.

Accordingly, I dissent and would affirm the judgment of sentence.