470 A.2d 498

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Joseph George ROMERI, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 27, 1983.

Decided Dec. 30, 1983.

___

126

Thomas J. Calnan, Jr. (Court-appointed), Allentown, for appellant.

William Platt, Dist. Atty., for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

On April 12, 1979 Appellant was convicted by a jury in the Court of Common Pleas of Lehigh County of second degree murder, burglary, theft by unlawful taking, receiving stolen property, and criminal conspiracy. Post trial motions were filed and denied, and appellant was sentenced to life imprisonment on the murder conviction and a consecutive term of two to seven years on the other convictions. Appeal was taken to Superior Court, 314 Pa.Super. 279, 460 A.2d 1139, which affirmed, and thereafter, petition for allowance of appeal to this Court was granted. We now affirm.

The facts of the case are that on November 9, 1978, two boys, Joseph Romeri, aged 16, and Michael Reinhard, aged 17, broke into the house of an 80 year old woman, Stella Bremmer. Appellant—Romeri—had been Mrs. Bremmer's paper boy and was her neighbor. Appellant's version of what transpired in the house is that after taking a small amount of money, the two discovered Mrs. Bremmer in bed in an upstairs bedroom and that Reinhard held her down while appellant struck her with something. Reinhard's version is that after entering the house, he waited in the kitchen while appellant explored the living room and then the second floor. After hearing muffled sounds upstairs, Reinhard went up to find appellant standing with a pipe in his hand next to Mrs. Bremmer's bed, where her bloody body lay. The two ran from the house and had a snack at a local store, then returned to the house to see if Mrs. Bremmer was dead. She was not, and after covering her body with a sheet—according to Reinhard, while she continued to moan—they took more money and left the house. Mrs. Bremmer subsequently died of the beating.

On November 13, 1978 appellant was questioned by police and made a confession implicating Michael Reinhard. Reinhard then made a separate statement placing main responsibility for the murder on appellant. Thereafter, the Com-

monwealth accepted Reinhard's plea to third degree murder in return for his testimony against appellant.

On March 20, 1979 pre-trial hearings were held on motions to transfer the Romeri and Reinhard cases to juvenile court, motion to suppress certain evidence, and motion for bail. Although counsel for appellant requested that a single hearing be held on the motions to suppress and transfer, the trial court elected to hold separate hearings on these motions, the hearing on the motion to transfer being public and the hearing on suppression matters being *in camera.* At the transfer hearing, the Commonwealth produced an inculpatory letter allegedly written by appellant. The letter stated, *inter alia:* "I have a chance of being found not guilty. That means I can get away with murder."

■ On March 29, 1979 the court denied both appellant's motion to transfer and the motion to suppress appellant's confession, and the court filed an opinion in the transfer matter. On April 2, 1979 the case was attached for jury trial and on that day a newspaper article appeared which reported on the court's opinion on the transfer motion. In pertinent part, the article stated:

"Statements subsequently made by Romeri and Reinhard indicated it was Romeri who was primarily responsible for the beating which led to Mrs. Bremmer's death," the judge wrote in outlining details of the crime.

"The motive for the beating was apparently theft, as the boys admitted taking a small amount of money from Mrs. Bremmer's home.

"According to Romeri's statement, the boys—after striking her with a pipe—left her house because she was 'making funny noises.' But after getting something to eat, they went back into the house in a second burglary of the home."

\*       \*       \*       \*       \*       \*

Other evidence showed Romeri was a poor student, habitual truant and a continual heavy abuser of alcohol and drugs.

Judge Backenstoe said the most favorable points made by the defendant's attorney were his youth and the fact he made a voluntary statement to police several days after the homicide.

But the judge found this greatly neutralized by the fact Romeri wrote his girl friend from prison, attempting to enlist her support to get his mother to say she didn't understand what was going on when she gave her son permission to make a statement.

Judge Backenstoe says Romeri rather candidly states in that letter that his lawyer says "I have a chance of being found not guilty, that means I can get away with murder."

The judge said this is not an appropriate case to transfer to juvenile court ... [because of] previous contact with law enforcement agencies, his direct roll [sic] in the killing of Mrs. Bremmer as well as his almost complete, callous disregard of the enormity and horror of his actions.

*The Morning Call* (Monday, April 2, 1979). Beginning on April 3, 1979 prospective jurors were called for *voir dire*, and on April 9, 1979 after *voir dire* testimony comprising 970 pages of transcript in which extensive questioning of prospective jurors was carried out, a jury was sworn. Counsel for appellant moved for a change of venue after this newspaper article appeared. The trial court held this motion under advisement until the jury was selected on April 9, and at that time the motion was denied. Appellant's first claim is that it was error for the trial court to deny the motion for a change of venue because the newspaper article excerpted *supra* was inherently prejudicial [1] and

1. We note that the term "inherently prejudicial" has undergone a process of clarification in our case law. In the early cases, the term has sometimes been read—erroneously—to mean that publicity which, *per se*, in the abstract, requires a change of venue. Later cases, however, make it clear that the term means that publicity which, *if it has saturated and prejudiced the community*, requires a change of venue. The prejudice with which we are concerned is prejudice as it applies to the case at hand, not prejudice in the abstract. Thus, in *Commonwealth v. Casper,* we stated:

made appellant's constitutional right to a fair trial impossible.

Our statement of the law in this area may be summarized by reference to *Commonwealth v. Casper:*

Our cases make it clear that an application for a change of venue is addressed to the sound discretion of the trial court, and its exercise of discretion will not be disturbed by an appellate court in the absence of an abuse of discretion. *E.g., Commonwealth v. Scott,* 469 Pa. 258, 266, 365 A.2d 140 (1976); *Commonwealth v. Hoss,* 469 Pa. 195, 199, 364 A.2d 1335 (1976); *Commonwealth v. Kichline,* 468 Pa. 265, 273, 361 A.2d 282 (1976); *Commonwealth v. Powell,* 459 Pa. 253, 289, 328 A.2d 507 (1974); *Commonwealth v. Russell,* 459 Pa. 1, 326 A.2d 303 (1974). "In reviewing the trial court's decision, the only legitimate inquiry is whether any juror formed a fixed opinion of [the defendant's] guilt or innocence as a result of the pre-trial publicity." *Commonwealth v. Kichline, supra,* 468 Pa. at 274, 361 A.2d at 287. Normally, one who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the empaneling of the jury. See *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Commonwealth v. Rolison, supra; Commonwealth v. Hoss,* 469 Pa. 195, 201, 364 A.2d 1335 (1976); *Commonwealth v. Pierce,* 451 Pa. 190, 195, 303 A.2d 209, *cert. denied,* 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). But this rule is subject to an important exception. In certain cases there "can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the

The critical factor in the finding of presumptive prejudice ... is the *recent and pervasive presence* of "inherently prejudicial" publicity, the likely effect of which is to render a fair trial impossible. 481 Pa. 143, 154, 392 A.2d 287, 293 (1978). Emphasis supplied.

In the present Opinion we use the term "inherently prejudicial" to mean what it meant in *Casper:* publicity which is harmful to the accused, and which may or may not require a change of venue depending upon what effect it has had in the community from which prospective jurors are drawn.

defendant to any burden of establishing a nexus between the publicity and actual jury prejudice," *Commonwealth v. Frazier,* 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977), because the circumstances make it apparent that there is a substantial likelihood that a fair trial cannot be had. 481 Pa. 143, 150–151, 392 A.2d 287, 291 (1977). We also stated in *Casper* that it is not required that jurors be totally ignorant of the facts in the case, for if this were required, given modern methods of communication, it would be impossible to empanel a jury in many cases. Rather, "it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 481 Pa. at 152, 392 A.2d at 292, quoting *Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

■ Finally, we observed in *Casper* that even if there has been extensive pre-trial publicity, a fair trial is not necessarily precluded. Instead, once the fact of pre-trial publicity is determined, the inquiry then turns to the nature of the publicity and its effect on the community. Factors to be considered in determining the nature of the publicity include the following:

> whether the pre-trial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of sensational, inflammatory and "slanted articles demanding conviction" ...; whether the pre-trial publicity revealed the existence of the accused's prior criminal record; whether it referred to confessions, admissions or reenactments of the crime by the defendant; and whether such information is the product of reports by the police and prosecutorial officers.

481 Pa. at 152–153, 392 A.2d at 292 (footnotes and citations omitted).[2]

**2.** This summary of pre-trial publicity which may require a change of venue is derived from our decision in *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973) where this Court stated:

> [W]e rule that in this Commonwealth policemen and members of the staffs of the office of District Attorneys shall not release to the news media: (a) the existence or contents of any statement or

■ It seems reasonably clear in this case that a number of red flags have been raised suggesting that inherently prejudicial matter appeared in the newspaper article cited *supra.* First, although the article is factual in nature, and cannot fairly be characterized as demanding conviction, it does quote the letter in which appellant states that he may be able to "get away with murder"—the letter is sensational if the reportage is not; second, the article refers to confessions; third, there is reference to previous contact with law enforcement agencies; and fourth, there is implicit in the story the trial court's view that appellant is guilty of the crime. Thus, we conclude that the publicity in this case was inherently prejudicial.

■ Nevertheless, once it has been determined that inherently prejudicial information has been published, the inquiry does not end there. The dissemination of such publicity does not automatically raise the presumption that a fair trial is impossible. The passage from *Casper* cited immediately above continues:

Should any of the above elements [of inherently prejudicial publicity] be found, the next step of the inquiry is to

confession given by the accused, or his refusal to give a statement or to take tests; (b) prior criminal records of the accused, including arrests and convictions; (c) any inflammatory statements as to the merits of the case, or the character of the accused; (d) the possibility of a plea of guilty; (e) nor shall the authorities deliberately pose the accused for photographs ... which connect him with the scene of the crime....

451 Pa. at 200, 303 A.2d at 215. In *Commonwealth v. Kichline*, however, we observed that what we were dealing with in *Pierce* was a prejudicial effect similar to the effect of articles in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). 468 Pa. at 275 n. 4, 361 A.2d at 288 n. 4, where publicity was extensive, pervasive and outrageous. In *Rideau* a filmed interview was televised in which the defendant admitted commiting a bank robbery, kidnapping, and murder. This interview was shown repeatedly on all local television stations. In *Sheppard* the Court characterized the publicity as "massive, pervasive," and "virulent." The Court of Appeals stated that the publicity was "perhaps unparalleled in recent annals." 384 U.S. at 356, 86 S.Ct. at 1519, 16 L.Ed.2d at 616. Thus, it is apparent that the rule laid down in *Pierce* was promulgated in a context of extensive, outrageous and prejudicial publicity.

determine whether such publicity has been so extensive, so sustained and so pervasive that the community must be deemed to have been saturated with it.

*Id.* We also noted in *Casper* that it is relevant whether there has been a "cooling-off period" between the publicity and the beginning of trial. 481 Pa. at 154, 392 A.2d at 293. Thus, if a community is saturated with inherently prejudicial materials, and that prejudice has not had time to dissipate, an impartial jury cannot be empaneled regardless of the good intentions of jurors who may honestly believe that they can disregard what they have read or heard about the case. The direction of inquiry as to whether inherently prejudicial publicity may be said to preclude a fair trial, therefore, may be stated as follows: "[t]he critical factor in the finding of presumptive prejudice ... is the *recent* and *pervasive presence* of 'inherently prejudicial' publicity, the likely effect of which is to render a fair trial impossible." *Commonwealth v. Casper*, 481 Pa. at 154, 392 A.2d at 293 (Emphasis supplied).

■ Our question in this case, then, is whether the inherently prejudicial material contained in the newspaper article at issue, is "recent" and whether its presence was "pervasive." Since the article appeared on the day jury selection was to begin, it is certainly recent. Whether its effect was "pervasive," however, is another matter. In this case, of the 88 prospective jurors called, only 7 indicated that they had a fixed opinion as to the guilt of appellant. Thus, it is impossible to conclude that the publicity was pervasive or that the community had been saturated with prejudicial communication where fewer than 8% of jurors questioned indicated that they had a fixed opinion as to guilt of appellant. *Compare: Commonwealth v. Cohen*, 489 Pa. 167, 413 A.2d 1066 (1980) (change of venue required where 53% of prospective jurors questioned were excused because of prejudgment, i.e., a "fixed and irrevocable opinion on guilt"); *Commonwealth v. Casper, supra* (no change of venue required where 2 out of 42 prospective jurors knew of case and could not decide on the basis of evidence at

trial); *Commonwealth v. Stoltzfus*, 462 Pa. 43, 337 A.2d 873 (1975) (no change of venue required where 31 out of 139 prospective jurors questioned formed fixed opinions); *Commonwealth v. Hoss*, 445 Pa. 98, 283 A.2d 58 (1971) (no change of venue required where 26 of 138 jurors questioned had formed opinion). Citations taken from *Commonwealth v. Cohen*, 489 Pa. at 186–187, 413 A.2d at 1077. *Moreover, of the fourteen jurors empanelled in this case, none of them read the article in question,* although four of them had read of the case several months prior to trial when the crime occurred.

■ In summary, none of the jurors empaneled had formed a fixed opinion of appellant's guilt, and fewer than 8% of the total number of jurors questioned had formed a fixed opinion as to appellant's guilt. Further, no one was empaneled who had read the article in question. Thus, it can hardly be said that the community was saturated with prejudicial publicity or that such publicity made it impossible for appellant to get a fair trial. Although we have approved the use of public opinion polls indicating the impact of prejudicial pre-trial publicity in a community, *See Commonwealth v. Cohen, supra*, 489 Pa. at 172 n. 5, 413 A.2d at 1069 n. 5, no evidence of such polls was offered in this case, and the trial court properly delayed ruling on defense counsel's motion for a change of venue until after *voir dire*, for it was only then that the court could determine whether the inherently prejudicial publicity in the case had made a fair trial impossible in that jurisdiction.[3] The court properly determined that it had not, and thus, appellant's allegation of error is denied.

■ Appellant next complains that it was error for the trial court to refuse his challenge for cause of four prospective jurors who had knowledge of the newspaper article

3. As we stated in *Commonwealth v. Bachert*, 499 Pa. 398, 410, 453 A.2d 931, 937 (1982), " 'After the *voir dire* a judge can determine which description of the publicity's impact is accurate; before the *voir dire* a judge could only have guessed,' " quoting *United States v. Haldeman*, 559 F.2d 31, 62, n. 37 (D.C.Cir.1976) (en banc), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

which appeared on April 2, 1979, thereby resulting in the premature exhaustion of appellant's peremptory challenges. This claim must be denied for two reasons. First, the four prospective jurors here at issue were removed by appellant's exercise of peremptory challenges, the last of these by appellant's seventh peremptory challenge. Appellant did not exhaust his peremptory challenges until prospective juror number 12 was being questioned. Thus, the jurors complained of were not seated on the jury and at the time they were being questioned, appellant had not exhausted his peremptory challenges. The law in Pennsylvania is well-settled in this circumstance:

> [W]hen ... the defense does not exhaust its peremptory challenges, it is harmless error to overrule a challenge for cause which should have been sustained, if the juror is actually excluded by a peremptory challenge....

*Commonwealth v. McGrew*, 375 Pa. 518, 526, 100 A.2d 467, 471 (1953). Citations omitted. This rule is more fully articulated in Wharton's *Criminal Procedure:*

> A party who has not exhausted his peremptory challenges cannot complain of the trial judge's action in overruling a challenge for cause. But if a challenge for cause is improperly overruled after he has exhausted his peremptory challenges, such a ruling would constitute reversible error.

§ 463, p. 277 (12th ed., 1975).

Second, even if all of appellant's peremptory challenges had been exhausted, the trial court did not err in overruling the challenges for cause, for each of the four persons in question (two of whom read the article and two of whom heard a discussion concerning the article) stated that they would be able to set aside anything he had heard or read and decide the case solely on the basis of evidence presented in court. We have often articulated:

> [t]he fact that a juror has read or heard about a case and has an impression or an opinion, or a prejudice is not ground for rejection for cause if he testifies and the Court believes that his opinion is not fixed and that he

can and will make up his mind solely from the evidence which will be presented at the trial of the case.

*Commonwealth v. McGrew*, 375 Pa. at 525, 100 A.2d at 470, Citations omitted; *Commonwealth v. Casper, supra; Commonwealth v. Bachert*, 499 Pa. 398, 408, 453 A.2d 931, 936 (1982). Because each of the four prospective jurors testified that he would be able to set aside his pre-trial knowledge of the case and decide whether the Commonwealth met its burden of proof beyond a reasonable doubt solely on the basis of evidence presented at trial, the trial court, in whose sound discretion such determinations rest, *See Commonwealth v. Bachert, supra*, 499 Pa. at 410, 453 A.2d at 937, did not err in overruling appellant's challenges for cause.

Finally, appellant contends that the trial court erred in allowing the initiation and prosecution of the non-homicide charges in adult court against a juvenile inasmuch as the court was without subject matter jurisdiction over the non-homicide charges and thereby denied appellant an opportunity to contest transfer of the non-murder charges from juvenile court to adult court. Appellant herein was charged with first degree murder, felony murder, burglary, theft, receiving stolen property and conspiracy. All of the charges arose from the same criminal episode.

▮ The Juvenile Act, 42 Pa.C.S.A. § 6322 provides, in pertinent part:

(a) General rule .... if it appears to the court in a criminal proceeding other than murder, that the defendant is a child, this chapter shall immediately become applicable, and the court shall forthwith halt further criminal proceedings, and, where appropriate, transfer the case to the division or a judge of the court assigned to conduct juvenile hearings, together with a copy of the accusatory pleading and other papers, documents, and transcripts of testimony relating to the case. *If it appears to the court in a criminal proceeding charging murder,* that the defendant is a child, *the case may*

*similarly be transferred* and the provisions of this chapter applied.

Emphasis supplied. The plain language of the statute is that if there is a criminal proceeding charging murder—as there was here, both as to first degree murder and felony murder—the case, i.e., the entire case or proceeding, including the non-murder charges, may be transferred to juvenile court,. but there is no absolute requirement of transfer. The court will exercise its discretion to transfer the case when "the young offender's need for care, guidance and control *as a juvenile* outweighs the state and society's need to apply legal restraint and discipline *as an adult.*" *Commonwealth v. Pyle*, 462 Pa. 613, 622, 342 A.2d 101, 104 (1975) Emphasis in original.

This reading of the statute—that jurisdiction over all murder and non-murder charges filed in the same criminal episode resides in the adult court—is bolstered by the consideration that it is unrealistic to believe that a youthful offender who the court determines cannot profit from the care, guidance and control aspects of a juvenile proceeding on the murder charge—as happened in this case—would be amenable to such care, guidance and control on the non-murder charges arising from the same criminal transaction. Moreover, as this Court stated in *Commonwealth v. Keefer:*

[I]t would make no sense to try a juvenile as an adult on a felony murder charge in the criminal division and as a juvenile on the underlying felony in the juvenile court division. To do so would not only subject the defendant to the ordeal of two trials but also to the hazard of inconsistent verdicts and separate sentences imposed by separate judges neither of whom possesses an over-all perspective. At a time when both this Court and the legislature in the recent Crimes Code, have signalled that all offenses arising out of a single criminal episode or course of conduct should, in the interest of fairness to a defendant, not to speak of economy of judicial resources, be tried together, it would be anomalous for us to man-

date a different result with respect to this juvenile charged with felony murder.

470 Pa. 142, 148–149, 367 A.2d 1082, 1085 (1977).

■ For these reasons we hold that the trial court had jurisdiction in this case and that where murder charges are filed in an adult court against a juvenile, that court also has jurisdiction over other charges filed and arising from the same criminal transaction. Therefore, this allegation of error is denied. *Compare Commonwealth v. Mitchell,* 283 Pa.Super. 455, 424 A.2d 897 (1981).

Judgment of sentence affirmed.[4]

NIX and ZAPPALA, JJ., file dissenting opinions.

NIX, Justice, dissenting.

I am of the view that here the press coverage was so "inherently prejudicial" that prejudice can properly be presumed. See *Commonwealth v. Pierce,* 451 Pa. 190, 303 A.2d 209 (1973), *cert. denied,* 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). I therefore dissent.

ZAPPALA, Justice, dissenting.

I must respectfully dissent from the majority opinion. Although there are several contentions which merit review, suffice it to say that only one is necessary for the purpose of reversal.

I must disagree with the majority's analysis of the change of venue issue in light of our holding in *Commonwealth v. Casper,* 481 Pa. 143, 392 A.2d 287 (1978). The

**4.** Appellant has also raised other allegations of error as follows: (1) it was error not to suppress appellant's confession; (2) it was error not to transfer the case to juvenile court; (3) appellant was denied equal protection by Commonwealth accepting co-defendant's plea to third degree murder; (4) appellant should not have been convicted of murder higher than third degree because of his voluntary ingestion of drugs and alcohol; (5) the Commonwealth did not comply with discovery rules; (6) it was error to permit voir dire on the death penalty; (7) the court erred in its charge to the jury; (8) the court erred in denying certain defense requests for jury instructions. We have reviewed each of these claims and find them without merit.

majority would now hold a two-step analysis is required before finding that pretrial publicity is of such a prejudicial nature as to warrant a change of venue even where that publicity is found to be inherently prejudicial. While this two-step approach may be correct in certain instances, the facts of the instant case certainly do not require such an approach.

The majority holds that the particular article in question, after a factual analysis, was *inherently prejudicial*, yet it now attempts to separate this prejudice on the basis of an inquiry into the effects of the article upon the jury. This approach is incorrect.

Black defines *inhere*, the root of *inherent*, as "exist[ing] in and *inseparable* from something else." BLACK'S LAW DICTIONARY 921 (4th Ed.1951) (Emphasis added). Therefore, where we find publicity to be *inherently prejudicial*, it becomes irrelevant to attempt to then separate that prejudice from those who may or may not have been affected by it.

What the majority fails to consider is our holdings in *Commonwealth v. Frazier*, 471 Pa. 121, 369 A.2d 1224 (1977), and *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973), cert. denied, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973).

> In [*Pierce* ] we held that there can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice. See also *Commonwealth v. Brado* [470] Pa. [306], 368 A.2d 643 (1977). In *Pierce* we found that the pretrial publicity itself constituted a denial of due process; the denial of due process was *inherent in the publicity.*

*Frazier, supra,* 471 Pa. at 127, 369 A.2d at 1227 (emphasis in original).

In *Casper,* we did not overrule *Frazier* or *Pierce*. Rather, we distinguished cases of inherently prejudicial publicity from those cases, such as *Casper,* where additional inquiry

was required because all the elements of inherently prejudicial publicity were not present.

Since the majority's definition of "inherently prejudicial" includes a finding of pervasiveness, I must assume by concluding that the publicity here was inherently prejudicial, the majority also found it to be pervasive. I would agree with this conclusion on the basis that the article was published, circulated and contained each of the elements deemed necessary to find it inherently prejudicial, thus requiring a change of venue without further inquiry.

For this reason alone, I would reverse the holding of the Superior Court.