## Commonwealth v. Beers & Smith

*James F. Marsh,* Assistant district attorney, for the Commonwealth.

*William Sayer,* for defendant Beers.

*James Fareri,* for defendant Smith.

WILLIAMS, *S.J.*, June 7, 1984—This matter is before us on petitions of defendants to grant either a change of venue or a change of venire. The four cases captioned above, all deal with the same incident. Defendants seek the change of venue or venire on the assertion that presumptive prejudice exists due to the inculpatory nature of the pre-trial publicity and for the additional reason that the pretrial publicity has been sustained, extensive and pervasive.

## FINDINGS OF FACT

1. The 1980 census shows a county population of 69,409.

2. The 1983 records of the Pocono Record, published in Monroe County, shows that Monroe County has 28,800 occupied households.

3. The morning circulation of said newspaper from Monday to Saturday in the year 1983 was 16,158. The Sunday circulation in Monroe County of said paper was 17,253.

4. The Pocono Record is the only newspaper published in Monroe County and is widely read by residents of the county.

5. The Call-Chronicle, published in Allentown, Pa., in 1984 has a circulation in Monroe County of 3,506.

6. The Easton Express published in Easton, Pa., has a circulation of 1,813 in Monroe County.

7. In addition to coverage of the incidents here involved, there has been extensive and sustained coverage by television station, Channel 16, of Scranton, Pa.

8. A headline in large type published in the Pocono Record edition of May 18, 1984 reads: "Kidnap Suspect Recalls Confession." The accompanying

article refers to testimony by defendant Beers that he had made the confession after he was told by police he could be imprisoned for 40 years and it would be easier on him if he confessed.

9. The headline in the Call-Chronicle of the same date, reads: "Kidnapping Suspect Says He Confessed To Go Home."

10. Both headlines are factually correct.

11. A headline in the Pocono Record edition of January 19, 1984, reads: "Two Men Charged in Monroe Kidnapping." The accompanying article states: "District Attorney James F. Marsh said the kidnapping and murder plots were meant to extract ransom from families that Smith and Beers believed to be wealthy." The article quotes the district attorney as saying: "My understanding is they were preparing to ask in the vicinity of $100,000 in the Laky case." "Marsh said, 'I'm not sure what it was in the other case. Smith and Beers had obtained passports awhile ago Marsh said, and were planning to leave the country after receiving the ransom and murdering the girl.' "

12. The January 20, 1984, edition of the Pocono Record attributes the following statement to the district attorney, "There is evidence that Smith and Beers were preparing to flee the country when state police from the Fern Ridge Barracks and Lehighton Barracks took them in custody Wednesday afternoon." This article further states, "In fact, I understand they were going to leave today, Thursday or tomorrow, for England and that they were going to go some place from England, Marsh said. Noting that both men possessed passports."

The article states that the district attorney stated their ultimate destination was Saudia Arabia, where defendants were believed to have worked on construction projects in the past. He said the police

were checking to see if they obtained airplane tickets.

13. The January 20, 1984, edition of the Call-Chronicle quotes the district attorney as saying: "Monroe County District Attorney James F. Marsh said that Smith and Beers had obtained passports with intention of leaving the country after receiving the ransom and murdering the Laky girl."

14. In addition to the press coverage, there has been sustained and pervasive publicity by both radio and television stations located in the Scranton/Wilkes-Barre area and the Lehigh Valley area, all of which reach the homes of Monroe County residents.

15. While we find that the publicity has been objective, not sensational and not demanding conviction, the publicity has been sustained, pervasive and contains inculpatory admissions by defendant Beers which inculpate both Beers and Smith.

16. The publicity has reached the homes of most of the persons who will be summoned as members of the panel from which the jurors to try the case will be selected.

## DISCUSSION

Defendants seek a change of venue or venire based on the assertion that the nature of pre-trial publicity in the press, radio and television has so prejudiced the defense, that a fair trial is not obtainable, if the jury is selected from residents of Monroe County.

Pre-trial publicity is either presumptive or actual. The defense asserts the presence of presumptive prejudice in the present case.

Defendants are charged with the kidnapping of Cassandra Laky, age eight, of attempting to murder

her and with robbery, theft and assault. It appears from the evidence taken at the preliminary hearing that Cassandra Laky was kidnapped by two masked men. That they transported her to a location on Dorshimer Road in Brodheadsville. That one of the kidnappers forced her body through the seat of an abandoned privy. She was left in the bottom of the privy. Her face was bruised and cut when she was forced through the seat of the privy. She escaped, walked bare-foot through snow until picked up by a passing motorist. The atrocious nature of the crime has undoubtedly attracted wide public attention and indignation.

The law applicable to the issue before us is well established in Pennsylvania. A comprehensive review of the appellate court cases which have dealt with the issue are found in Commonwealth v. Casper, 481 Pa. 143, 392 A.2d 287 (1978). There the court said:

"Normally, one who claims that he has been denied a fair trial because of prejudicial pre-trial publicity must show actual prejudice in the enpaneling of the jury. See Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Commonwealth v. Rolison, supra; Commonwealth v. Hoss, 469 Pa. 195, 201, 364 A.2d 1335 (1976); Commonwealth v. Pierce, 451 Pa. 190, 195, 303 A.2d 209, cert. denied, 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973). But this rule is subject to an important exception. In certain cases there 'can be pretrial publicity so sustained, so pervasive, so inflammatory, and so inculpatory as to demand a change of venue without putting the defendant to any burden of establishing a nexus between the publicity and actual jury prejudice,' Commonwealth v. Frazier, 471 Pa. 121, 127, 369 A.2d 1224, 1227 (1977), because the circumstances make it apparent that there is a substantial

likelihood that a fair trial cannot be had. See Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Commonwealth v. Rolison, supra; Commonwealth v. Dobrolenski, 460 Pa. 630, 334 A.2d 268 (1975), citing American Bar Association Standards Relating to Fair Trial and Free Press §3.2 (Approved Draft, 1968); Commonwealth v. Pierce, supra.[6] (Footnote omitted.) It is this exception that we must discuss here."

The court stated that the mere fact that there has been pre-trial publicity and that jurors have some knowledge of the facts attendant upon the crime, does not warrant a change of venue. It then sets standards by which the hearing judge should make a determination of the issue, as follows:

"We instead look to more discrete factors, viz., whether the pre-trial publicity was, on the one hand, factual and objective, or, on the other hand, consisted of sensational inflammatory and 'slanted articles demanding conviction,' United States v. Sayers, 423 F.2d 1335, 1343 (4th Cir. 1970);[7] (Footnote omitted.) whether the pre-trial publicity revealed the existence of the accused's prior criminal record;[8] (Footnote omitted.) whether it referred to confessions, admissions or reenactments of the crime by the defendant;[9] (Footnote omitted.) and whether such information is the product of reports by the police and prosecutorial officers.[10] (Footnote omitted.) Should any of the above elements be found, the next step of the inquiry is to determine whether such publicity has been so extensive, so sustained and so pervasive that the community must be deemed to have been saturated with it. In this connection the size and character of the area concerned, and more particularly the prevasiveness of the media coverage in the community, warrant consideration."

Consistent with Casper is Commonwealth v. Keeler, 302 Pa. Super. 324, 488 A.2d 1064 (1982), where the court held that the mere existence of pre-trial publicity does not warrant a presumption of prejudice. In that case the newspaper articles contained information as to the past criminal record of the defendant. It also contained information given by the police and the district attorney. The court held that these circumstances were not sufficient in themselves to require a change of venue. That it was necessary to determine whether the publicity was pervasive that the community was saturated without sufficent time between publication and trial for prejudice to dissipate.

Under the case law of Pennsylvania, once elements of presumed prejudice are shown we must, as stated in Casper, look to the size of the community and the nature of the pre-trial publicity. We must also look at the lapse of time between publication and trial.

Looking first at the size of the community, according to the last census, we have a population of 69,409. There are 28,800 occupied residences in the county. The combined daily circulation of three newspapers circulated in Monroe County is 21,477. Thus the combined circulation of the newspapers reach approximately 72 percent of the occupied residences of the county. This percentage may be reduced by the likelihood that some residents subscribe to more than one paper. In addition to the press coverage, is the television and radio coverage, which is available practically to every resident of the county. The Allentown-Bethlehem, as well as the Scranton/Wilkes-Barre television channels have broadcast information concerning the offenses here charged.

The pre-trial publicity has been sustained as well as pervasive. It began with the public learning of the crime about January 14, 1984, and has continued to date. It has reached, as was the case in Community v. Frazier, 471 Pa. 121, 369 A.2d 1224 (1977), the home of every prospective juror in the county.

We have in our findings of fact referred to headlines in the Pocono Record and the Call-Chronicle dealing with the confession of defendant Beers. These articles and accompanying headlines were published on May 18, 1984, following a suppression hearing on May 17, 1984. We refused defendant's request to close the hearing to the news media. We did so stating that we had the duty to preserve the right of a free press and had the duty to adopt a procedure to protect defendants' right to a fair trial. In Frazier, the Supreme Court held that a lapse of four months between publication and trial was an insufficient period of time in which prejudice would dissipate. Trial here is scheduled to begin on or about July 5, 1984, a much less period of time than present in Frazier. The court in Frazier also placed strong emphasis on the size of the community and the extent to which pre-trial publicity had prevaded the residences of prospective jurors.

The defense offered no proof of actual prejudice and relies entirely on presumptive prejudice to support its motion.

Frazier, like the case before us, dealt with a vicious violent crime. The murder of a young school girl. The trial judge denied chage of venue. Defendant was convicted and sentenced to life imprisonment. The Supreme Court reversed and ordered a change of venue. The Frazier case resembles the instant case in a number of respects, and we believe it controls this case. It differs in that here the media

acted with far more restraint than was the case in Frazier. But because the elements of presumed prejudice are present and the size of the community consideration is similar to Frazier and the sustained and pervasive nature of the pre-trial publicity is similar to Frazier, we conclude that we are mandated by Frazier to grant defendants' motion.

We will grant a change of venire, which we believe will better serve the convenience of all persons concerned with the trial. It will render unnecessary the expense of transportation and housing of witnesses and permit local residents to attend the trial with a minimum of inconvenience.

We refused to exclude the press from the suppression hearing held on May 17, 1984. That decision resulted in the publicity of May 18, 1984. We are firmly committed to the principle that we must protect the First Amendment rights of the press and the Sixth Amendment rights of defendants to a fair trial. While the grant of a change of venire will cause some inconvenience in the selection of a jury and possibly increase the cost of trial to some extent, we believe that is a small price to pay to leave the news media unshackled and free to fully inform the residents of Monroe County what takes place in the court.

A change of venire serves a dual purpose. It protects the First Amendment rights of the press and the Sixth Amendment rights of defendants.

## ORDER

And now, June 7, 1984, defense motion for change of venire is granted.