J-A18015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CARMELO RODRIGUEZ, | |
| Appellant | No. 82 MDA 2016 |

Appeal from the Judgment of Sentence Entered August 19, 2015
In the Court of Common Pleas of Lebanon County
Criminal Division at No(s): CP-38-CR-0001581-2014

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED OCTOBER 04, 2016**

Appellant, Carmelo Rodriquez, appeals from the judgment of sentence of 6 to 20 years' imprisonment, imposed after he was convicted of one count of aggravated assault pursuant to 18 Pa.C.S. § 2702(a)(1), and one count of aggravated assault pursuant to 18 Pa.C.S. § 2702(a)(4).  Appellant challenges the sufficiency of the evidence to sustain his convictions and alleges the verdict is against the weight of the evidence.  We affirm.

Appellant's convictions stemmed from an altercation that occurred outside of a bar in Lebanon, Pennsylvania, on the night of August 4, 2014.  After Appellant's first jury trial ended in a mistrial, a second jury trial was held on June 4, 2015, where Appellant was found guilty of two counts of

_____

[*] Former Justice specially assigned to the Superior Court.

aggravated assault. Trial Court Opinion (TCO), 12/7/15, at 2. Appellant was sentenced to the above-stated term on August 19, 2015. On August 31, 2015, Appellant filed post-sentence motions, which included a motion for new trial, a motion for judgment of acquittal, and an allegation that the sentence was excessive. The trial court denied Appellant's post-sentence motions by order dated December 4, 2015. Appellant proceeded with the timely filing of a notice of appeal on January 4, 2016, followed by a timely concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Herein, Appellant presents the following issues for our review: (1) Whether the Commonwealth failed to present sufficient evidence at trial to support the jury's verdict of guilty?; and (2) Whether the jury's verdict was against the weight of the evidence? Appellant's Brief at 4.

To begin, we note our standard of review of a challenge to the sufficiency of the evidence:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt.

***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011) (citations omitted).

Appellant was convicted of one count each, respectively, of aggravated assault under the following provisions of the Pennsylvania Crimes Code:

(a) **Offense defined.—**A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

…

(2) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon.

18 Pa.C.S. § 2702(a)(1) and (a)(4). "Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk or death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301. For purposes of an aggravated assault charge, "an 'attempt' is found where an accused who possesses the required, specific intent acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another. An intent ordinarily must be proven through circumstantial evidence and inferred from acts, conduct or attendant circumstances." *Commonwealth v. Fortune*, 68 A.3d 980, 984 (Pa. Super. 2013) (internal citations omitted).

Before addressing whether the elements of the above-stated crimes have been met, we review the facts reflected in the record of the jury trial

- 3 -

which led to Appellant's convictions, as summarized by the trial court in its

Pa.R.A.P. 1925(a) opinion:

Michael Morris (hereinafter "Morris"), a friend of Randy Wolfe (hereinafter "victim") testified for the Commonwealth. On August 4, 2014, Morris and the victim were at the William Penn bar (hereinafter "bar") in Lebanon, having a couple of drinks. Morris stated that when they were at the bar, the victim, who is very outgoing, was socializing with several people, playing games and performing magic tricks. At a later point in the evening, Morris heard a commotion by the door and saw the victim with three guys: Frank Velez (hereinafter "Velez"), [Appellant,] and Dennis Kreider (hereinafter "Kreider").

Morris followed the group outside and saw the victim, [Appellant,] and Velez walking up the street; the victim and Velez were arguing. Morris stated that when [Appellant] walked behind a tree, he bent down where loose bricks were present. At some point during the verbal altercation between the victim and Velez, the victim spit on [Appellant]. The victim told [Appellant] it was an accident and Morris stated the victim went to wipe the spit off of [Appellant]. When the victim went to wipe the spit off of [Appellant], [Appellant] hit the victim and the victim fell straight back. When Morris saw the victim get hit, he punched [Appellant], knocking him down. [Appellant] and his two friends immediately got in their car and left.

Kreider testified that he and [Appellant] have been friends for approximately 30 years. When Kreider, Velez and [Appellant] were in the bar, Kreider saw Velez hit the victim in the face one time and heard the victim scream to Velez that Velez "hit like a girl." Thereafter, the bartender told [Appellant] and Velez to leave the bar. Kreider followed them outside, at which point [Appellant], Velez and the victim were already walking away down the street, with [Appellant's] back towards Kreider.

Shortly after coming outside, Kreider witnessed [Appellant] make a "fighting motion," and then the victim's friend, Morris, punched [Appellant] in the face. Kreider, Velez and [Appellant] immediately headed to their car and left. As they were leaving, Kreider heard a girl yell, "you pussy, you hit him with a brick." When Kreider asked [Appellant] in the car if [Appellant] hit the

victim with a brick, [Appellant] replied, "I hit the nigger." However, Kreider did not see [Appellant] hit the victim with a brick.

Velez testified that during his time at the bar, he got into a physical altercation with the victim where he threw a few punches because the victim had gotten in Velez's face about a petty argument Velez was having with a third individual. Velez stated that he did not knock the victim over and that he didn't see any injuries besides "maybe a little blood on the side of his like lip or something." As Velez was trying to leave the bar, the victim was blocking Velez's way, until the bartenders forced the victim out of the way so Velez could leave.

When Velez went outside, the victim followed, wanting to continue the altercation that was started in the bar. At this point Velez stated "I was backing up and his arms were flailing. He said he wanted to get into it with me. So as I was backing up and I was taking off my shirt and my jewelry and then in an instant hey, let's get out of here." Velez testified that he did not see the victim get hit or see the victim laying on the ground because after he took off his shirt and jewelry, his friend was telling Velez to leave. When Velez, Kreider and [Appellant] got into the car to leave, [Appellant] asked Velez to take the blame for what happened, but Velez did not know what had happened and did not want to take the blame for anything. The next morning, the police asked Velez to come in to talk about what occurred the previous night, and he came in to cooperate with the police.

Detective Bret Fisher, a detective for the Lebanon City Police, stated that he obtained an arrest warrant for [Appellant] on the morning after the incident occurred. Through his investigation Detective Fisher learned that [Appellant] might have been staying with his uncle. Detective Fisher and Detective Uhrich went to look for [Appellant] and when they pulled up to the street where [Appellant's] uncle lived, the detectives saw someone that looked like [Appellant] on the uncle's front porch. The detectives exited the car and ran to the uncle's house, but the person they saw was not on the porch anymore. Detective Fisher watched the back of the house, and at the same time Detective Uhrich went inside the house to look for [Appellant]. However, they were not able to find [Appellant] at that time.

Detective Keith Uhrich received [Appellant's] cell phone number and attempted to make contact multiple times through text messaging. [Appellant] responded to Detective Uhrich, letting Detective Uhrich know that he was planning on turning himself in and gave Detective Uhrich a specific day he was going to turn himself in to the police. [Appellant] did not show up on the day that he informed Detective Uhrich that he would turn himself in to the police.

Detective Toby Pokrop testified that the Lebanon City Police Department informed him that [Appellant] was suspected of hiding at Robert Bittle's house. On August 20, 2014, Detective Pokrop drove by Bittle's house and saw two individuals in front who he did not recognize, working on a car. Detective Pokrop called the patrol officers on duty, Officer Snyder and Sergeant Hentz, to make contact with the individuals. Several minutes later, Detective Pokrop and the patrol officers made contact with Mr. Bittle and asked him if they could search the house for [Appellant], which he allowed. The patrol officers found [Appellant] hiding in the basement.

The Commonwealth also presented stipulated medical testimony from Dr. John Kelleher, a neurosurgeon at the Penn State Milton Hershey Medical Center and Dr. Jessica Lighthall, an Otolaryngologist. Dr. Kelleher determined that the skull fractures suffered by the victim were caused by blunt force trauma to the head, requiring a large amount of force to cause the injuries sustained.[2] Dr. Lighthall was on call the evening that the victim was transported to the Penn State Milton Hershey Medical Center and was needed to assist with the victim's injuries due to their complex nature. Dr. Lighthall's stipulated medical testimony closely mirrored Dr. Kelleher's testimony, specifically that the injury was caused by a blunt object and the injury is one that would require a significant amount of force.

[2] Dr. Kelleher made the following post-operative diagnoses:

1. Comminuted frontal depressed skull fracture;

2. Subarachnoid hemorrhage;

3. Pneumocephalus;

4. Intraparenchymal hemorrhage;

5. Diffuse axonal injury;

6. Orbital wall fractures; and

7. Complex midface fractures which shifted the face to the right.

Amber Green, a Forensic DNA scientist working with the Pennsylvania State Police was qualified as an expert and testified in regards to the DNA samples taken from the brick, which was collected at the scene of the incident. Ms. Green opined that one DNA sample from the brick matched the DNA sample given by the victim. Ms. Green further opined that [Appellant] could not be included as a contributor to the DNA samples collected from the brick.

[Appellant] took the stand and testified that while he was at the bar on August 4, 2014, he saw Velez get into an argument with the victim and subsequently punch the victim twice in the face. [Appellant] stated that he tried to deescalate the situation while in the bar by getting between Velez and the victim. When they were outside, [Appellant] stated he just watched Velez and the victim [] argue. After the victim spit on him, the victim reached out towards [Appellant]. The victim's action of reaching out towards [Appellant] made [Appellant] feel threatened and he punched the victim in the face. [Appellant] did not see what happened to the victim after he punched him because he was hit from the side and then immediately left with Velez and Kreider.

TCO at 2-7 (citations to the record omitted).

Here, Appellant contends that the evidence presented by the Commonwealth was sufficient to support a simple assault conviction only, and not a conviction of aggravated assault. Appellant's Brief at 11. Moreover, Appellant avers that the evidence was insufficient to prove that he used a brick during the assault. Appellant states that "[a]t best, the Commonwealth proved he bent down at some point before the punch to [the victim]." *Id.* After careful review of the record, we deem Appellant's arguments to be meritless.

As previously noted, a person may be convicted of aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." 18 Pa.C.S. § 2702(a)(1). Moreover, in *Fortune*, we examined the totality of the circumstances test created by the Pennsylvania Supreme Court in *Commonwealth v. Alexander*, 383 A.2d 887 (Pa. 1978), for the purposes of evaluating whether a defendant acted with the necessary intent to sustain an aggravated assault conviction.

> *Alexander* provided a list, albeit incomplete, of factors that may be considered in determining whether the intent to inflict serious bodily injury was present, including … the defendant's use of a weapon or other implement to aid his attack, and his statements before, during, or after the attack which might indicate his intent to inflict injury. *Alexander*, [383 A.2d] at 889. *Alexander* made clear that simple assault combined with other surrounding circumstances may, in a proper case, be sufficient to support a finding that an assailant attempted to inflict serious bodily injury, thereby constituting aggravated assault.

*Fortune*, 68 A.3d at 984.

In support of Appellant's aggravated assault conviction under 18 Pa.C.S. § 2702(a)(1), the trial court opined:

> In the matter at hand, Dr. Kelleher and Dr. Lighthall provided medical testimony opining that the injuries sustained by the victim were life threatening had they not been treated in a timely manner. Specifically, Dr. Kelleher diagnosed the victim with intraparenchymal hemorrhage, bleeding in the brain, which was particularly troubling because this type of hemorrhage can result in death or neurological dysfunction. The doctors provided

further testimony that the severe injuries sustained by the victim required a large amount of force, caused by a blunt object.

Furthermore, testimony was given that after the parties left the bar and were walking down the street, [Appellant] bent down behind a tree where loose bricks were located. Thereafter, [Appellant] punched the victim in the face and the victim fell straight back on to the sidewalk. The jury was free to determine that [Appellant] intended the natural and probable consequences of his actions. Accordingly, the evidence presented clearly was sufficient to sustain the charge of intentionally, knowingly or recklessly causing serious bodily injury.

TCO at 10 (internal citations to the record omitted). Viewing the evidence in a light most favorable to the Commonwealth, we conclude that the evidence was clearly sufficient to support a conviction of aggravated assault under Section 2702(a)(1).

With respect to Appellant's aggravated assault conviction under Section 2702(a)(4), aggravated assault is established under this provision when an actor "attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon." *Id.* Section 2301 defines "deadly weapon" as "any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." 18 Pa.C.S. § 2301. Our Supreme Court has stated that "a deadly weapon need not be … an inherently lethal instrument or device." *Commonwealth v. McCullum*, 602 A.2d 313, 323 (Pa. 1992). The Court further indicated that "an ax, a baseball bat, an iron bar, a heavy cuspidor, and even a bedroom slipper have been held to constitute deadly weapons under varying circumstances."

*Id.* Moreover, we have noted that an item which may not normally be considered a weapon, can be categorized as a deadly weapon based on its use under certain circumstances. *Commonwealth v. Raybuck*, 915 A.2d 125, 128 (Pa. Super. 2006).

As the trial court explained in its well-thought-out opinion:

> In the matter *sub judice*, a brick was determined to be a deadly weapon. In ordinary circumstances a brick is used as a building material, and therefore not a deadly weapon. However, where a brick is used to hit another person in the face causing serious bodily injury, that brick can then be viewed as a deadly weapon. The jury determined that the brick was used by [Appellant] to hit the victim in the face. Furthermore, it was already determined that the victim suffered serious bodily injury. Therefore, there is sufficient evidence to find that the victim suffered bodily injury due to the use of a deadly weapon.

TCO at 11. Again, viewed in a light most favorable to the Commonwealth, we discern that the evidence clearly supports Appellant's conviction of aggravated assault under Section 2702(a)(4).

Next, we address Appellant's challenge to the weight of the evidence to support his convictions.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted

where the facts and inferences of record disclose a palpable abuse of discretion.

***Commonwealth v. Houser***, 18 A.3d 1128, 1135-36 (Pa. 2011) (citations and internal quotation marks omitted).

Appellant argues that the jury "improperly weighted the testimony" when they determined his guilt of aggravated assault. Appellant's Brief at 12. More specifically, he testified at trial that he did not use a brick when he hit the victim, and he argues that the jury should have afforded his testimony greater weight and credibility. TCO at 12. However, as the trial court noted in its opinion:

> [Appellant's] argument ignores the well-settled principles of law that the finder of fact is free to believe all, part, or none of the evidence, and the fact finder makes credibility determinations. ***Com[monwealth] v. Gibbs***, 981 A.2d 274, 282 (Pa. Super. 2009). The jury was free to believe the Commonwealth's witnesses, and the jury was free to weigh the Commonwealth's witnesses' testimony accordingly. This [c]ourt cannot disturb the jury's credibility determinations.

TCO at 12. We ascertain no abuse of discretion by the trial court.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/4/2016

- 11 -