J-E03003-25

2026 PA Super 114

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| JAMES LEE HERLTH | : | |
| Appellant | : | No. 183 MDA 2024 |

Appeal from the Judgment of Sentence Entered December 7, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0005812-2022

BEFORE:  BOWES, J., OLSON, J., STABILE, J., DUBOW, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., McLAUGHLIN, J., and BECK, J.

DISSENTING OPINION BY BOWES, J.:                    **FILED: JUNE 5, 2026**

In my view, Pennsylvania State Police Trooper Dylan Adams did not execute an unconstitutional search by shining his flashlight towards a one-inch hole in a shoebox and observing illegal narcotics therein because the contraband was in plain view and subject to seizure pursuant to the plain view doctrine.  Accordingly, I would uphold the trial court's order denying suppression and affirm Appellant's judgment of sentence.  I therefore respectfully dissent.

The Majority aptly recounts the factual background of this matter, so I need not do so at length.  It suffices to reiterate that during the incident in question, Trooper Adams was lawfully at Appellant's residence aiding emergency medical personnel who were responding to Appellant's overdose. While standing in the living room at Appellant's feet, Trooper Adams observed

a shoebox next to the trooper's left leg, less than a foot away. The side of the box facing the trooper had a hole that was one inch in diameter. The hole was situated such that half of it was on the top of the box and the other half was on the side, so that one could look down directly into the box through the hole. Without moving or otherwise manipulating the box, and without repositioning himself or bending down, Trooper Adams shined his flashlight at the side of the box with the hole. Upon doing so, he could distinctly see a clear baggie, containing multiple white capsules, leaning against that side of the box. Based upon his training and experience, the trooper was "100 percent confident" that the contents were "scramble capsules," which are transparent capsules containing a mixture of illegal drugs, most commonly fentanyl, cocaine, and methamphetamines. *See* N.T. Hearing, 3/16/23, at 8.

Trooper Adams immediately opened the lid of the shoebox to seize the baggie containing 117 scramble capsules. In removing the lid to confiscate the narcotics, he observed approximately $1,700 in cash at the far end of the box. Therefore, the trooper took into evidence the shoebox and its contents. After being charged with a single count of possession with intent to deliver fentanyl, Appellant filed a motion to suppress, which the trial court denied following a hearing. A jury subsequently convicted Appellant of that crime.

Appellant's sole contention on appeal is that the court erred in denying his suppression motion. *See* Appellant's substituted brief at 4. My esteemed colleagues cogently and accurately recite the general principles relevant to

this issue. *See* Majority Opinion at 4-5. Therefore, I only briefly restate the most salient points:

> An appellate court's standard of reviewing the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Thus, our review of questions of law is *de novo*. Our scope of review is to consider [the evidence offered by the Commonwealth and] so much of the evidence for the defense as remains uncontradicted when read in the context of the suppression record as a whole.

*Interest of T.W.*, 261 A.3d 409, 416 (Pa. 2021) (citation omitted).

Further, "[t]he Fourth Amendment to the United States Constitution, incorporated to the states by and through the Fourteenth Amendment to the United States Constitution, and Article I, [§] 8 of the Pennsylvania Constitution protect citizens from 'unreasonable searches and seizures.'" *Id*. "Generally, for a search or seizure to be reasonable under the Fourth Amendment and Article I, [§] 8, police officers must first obtain a warrant before conducting the search or seizure. A search or seizure without a warrant is presumptively unreasonable subject to a few specifically established, well-delineated exceptions." *Id*. (cleaned up).

I agree with the Majority that, as far as a search is concerned, Appellant had a reasonable expectation of privacy regarding the items within the shoebox because it was in his home and, by closing the lid of the box, he had attempted, albeit unsuccessfully, to conceal the contents within. *See* Majority Opinion at 5-7. However, I dissent from the Majority's conclusion that a

search occurred simply because the trooper used his flashlight when he looked at the side of the box. *Id*. at 8-21. Rather, I determine that the capsules were plainly visible through the hole in the shoebox and were subject to seizure pursuant to the plain view doctrine.[1]

The Supreme Court of the United States has elucidated upon this doctrine thusly:

> The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property. The plain-view doctrine is often considered an exception to the general rule that warrantless searches are presumptively unreasonable, but this characterization overlooks the important difference between searches and seizures. If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. A seizure of the article, however, would obviously invade the owner's possessory interest. If "plain view" justifies an exception from an otherwise applicable warrant requirement, therefore, it must be an exception that is addressed to the concerns that are implicated by seizures rather than by searches.

*Horton v. California*, 496 U.S. 128, 133–34 (1990) (cleaned up).

To seize an item in plain view, three components must be met: (1) the officer must not have "violate[d] the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed[;]" (2) "its incriminating character must be immediately apparent[;]" and (3) the officer

---

[1] As such, unlike the Majority, I would not address the applicability of a caretaking exception. *See* Majority Opinion at 22-26.

"must also have a lawful right of access to the object itself." ***Commonwealth v. McCullum***, 602 A.2d 313, 320 (Pa. 1992) (cleaned up).

The Majority acknowledges that Trooper Adams was in a lawful vantage point at the time of the seizure since he was aiding emergency personnel in Appellant's living room in response to an overdose and, thus, was engaged in a community caretaking function. ***See*** Majority Opinion at 27. The second prong was met as the trooper immediately ascertained that the scramble capsules were illegal contraband. Finally, by observing the capsules without having previously taken any action to improperly manipulate or otherwise probe by touch the box in which they were stored, coupled with their obviously incriminating nature, Trooper Adams had a lawful right to access the contraband. Thus, I would conclude that the trial court did not err in denying Appellant's suppression motion.

In finding that the plain view doctrine does not apply to the matter *sub judice*, my colleagues rely upon our High Court's decisions in ***Commonwealth v. Graham***, 721 A.2d 1075 (Pa. 1998), and ***Commonwealth v. Norris***, 446 A.2d 246 (Pa. 1982). ***See*** Majority Opinion at 27-31. Respectfully, I find these cases materially distinguishable.

While Trooper Adams was unequivocally in a lawful position when he observed the shoebox and its contents, the officers in ***Norris*** were not. Initially, those officers were properly conducting a protective sweep of a residence. However, after that concluded, they lifted a mattress and seized a

gun they found underneath. The **Norris** Court found this sequencing of events critical:

> In fact, that difference [from how other items were seized during the sweep] nicely points up the distinction between the proper bounds of an exigent warrantless search and its incremental extension into an unreasonable intrusion. The gun could not have been seen without a thorough search of the bedroom. That search occurred after defendant was securely held and after it was apparent there was no one else in the apartment to endanger the officers. The failure to suppress it and its use at trial were, therefore, in error.

**Norris**, 446 A.2d at 250.

Likewise, the officer in **Graham** physically manipulated an item to bring the contraband into view, and in doing so exceeded the parameters of his authority to frisk the defendant pursuant to **Terry v. Ohio**, 392 U.S. 1 (1968), "the purpose of [which] is to dispel any fear that the stopped suspect is armed and dangerous and could harm police officers or the general public during a stop." **Interest of T.W.**, 261 A.3d at 422 (cleaned up). Specifically, as he "patted [Graham's] back pockets [the officer] felt what he believed was a Lifesavers Holes [candy] container. He shined a flashlight down into the pocket and noticed a Lifesavers Holes container which appeared, and was later determined to contain, 3.37 grams of crack cocaine." **Graham**, 721 A.2d at 1076-77.

On appeal, our High Court found that the facts did not support application of the plain view doctrine because the officer's "flashlight-aided search of [Graham's] back pocket occurred after his pat-down of [Graham]

revealed no evidence of weapons. Therefore, shining a flashlight into [Graham]'s back pocket extended the search beyond that authorized by *Terry*[.]" *Id*. at 1080. The Court also stated that the facts of that case were dissimilar to other scenarios wherein police used flashlights at night to aid in seeing objects that would be visible during the daytime because "the Lifesavers Holes container was not an exposed object" until the officer manipulated Graham's pocket and shined the flashlight into it. *Id*.

This contrast is further highlighted by our Supreme Court's decision of *Interest of T.W.*, which also entailed a *Terry* pat. In that case, a police officer frisked a juvenile and felt a hard object in his left pocket. The officer could not initially identify the object by feel, but feared that it could be a weapon, so he seized it and thereafter identified it as a glass medication bottle prescribed to another individual. *See Interest of T.W.*, 261 A.3d at 414. In considering whether suppression of that evidence was proper, our Supreme Court reaffirmed the settled proposition that items detected during a *Terry* frisk could be removed in only two circumstances: the officer has reasonable suspicion that the object is a weapon, or "it is immediately apparent that the object is illegal contraband." *Id*. at 422.

Importantly, the *Interest of T.W.* Court differentiated its facts from *Graham*, attributing to *Graham* the legal concept that it "was unreasonable for the police officers in [that and a similar case] to remove objects as part of a *Terry* frisk[,] as the police officers determined during those frisks that the objects were not weapons and where the plain feel doctrine did not justify the

removal of those objects." *Id*. at 423. In other words, our High Court recognized that *Graham* was a case involving the boundaries of *Terry* and the plain view doctrine where the item is felt during a frisk instead of seen with one's eyes, *i.e.*, the plain feel doctrine. Thus, although the Court in *Graham* did discuss and address plain view, the holding was nevertheless informed by the fact that the officers exceeded the limits of a *Terry* pat in conjunction with the use of a flashlight. Since Trooper Adams did not remove or seize the capsules as part of a frisk for weapons, I find *Graham* inapposite.

More critically, unlike the officers in *Norris* or *Graham*, Trooper Adams did not physically manipulate the shoebox to expose the contraband. His testimony instead revealed that the capsules were inside a clear baggie, which had been placed in the shoebox directly beneath the hole, and the capsules were immediately visible and their incriminating nature apparent upon illumination. Historically, officers have been permitted to use a flashlight to cast light upon incriminating evidence when they are in a legal vantage point, so long as they do not otherwise exceed the constraints of their authority. *See*, *e.g.*, *Texas v. Brown*, 460 U.S. 730, 740 (1983) (finding that an officer's conduct of shining a flashlight into a stopped car and changing his position to get a better view of certain angles inside the car did not violate the Fourth Amendment); *Commonwealth v. Milyak*, 493 A.2d 1346, 1348-49 (Pa. 1985) (same). *See also U.S. v. Law*, 384 F. App'x 121, 123–24 (3d Cir. 2010) (unpublished opinion) (holding that "there is nothing unreasonable about a police officer's use of a flashlight, a commonplace piece of police

equipment, to better illuminate the threshold of a closet.  A flashlight merely enhances an officer's vision; it does not expand its scope." (cleaned up)).[2]

From my review of the foregoing authority, the use of a flashlight to brighten an object is not, by itself, a "search" as that term is used for constitutional purposes.  My colleagues reach the opposite conclusion by relying upon two cases from other jurisdictions, namely, *People v. Hagestedt*, 270 N.E.3d 334 (Ill. 2025), and *State v. Tarantino*, 368 S.E.2d 588 (N.C. 1988).[3]  I am not persuaded that these decisions vitiate the applicability of the plain view doctrine in the matter at hand.

Different from Trooper Adams, who did not move himself or the shoebox before turning his flashlight towards the box and simply looking down at it, the officers in these other jurisdictions had to strain themselves and move their bodies, in addition to using a flashlight, in order to see items secreted behind solidly closed objects.  In *Hagestedt*, the Court determined that Officer Liebich had conducted a search, reasoning as follows:

> The cabinet was not only locked, but it was also visibly chained and padlocked in the closed position.  The cabinet was not secured with see-through netting or see-through glass panels.

---

[2] In citing this case I recognize that while we are not bound by decisions from the Third Circuit Court of Appeals, we can rely on the Third Circuit as "persuasive authority on questions of federal constitutional law[.]" *Commonwealth v. Hicks*, 208 A.3d 916, 936 n.13 (2019) (cleaned up).

[3] As the Majority concedes, it is well-settled that this Court is "not bound by these [out-of-state] cases[.]"  *Trach v. Fellin*, 817 A.2d 1102, 1115 (Pa.Super. 2003) (cleaned up).  *See also* Majority at 10 n.6.

Rather, the cabinet had solid wood doors that were not only closed but also secured shut with a chain and a padlock.

Liebich took deliberate action that was unrelated to his authorized intrusion [to investigate a possible gas leak], which constituted an independent search. While the cabinet itself was in plain view, its contents were not. The cabinet was secured with a chain and a padlock, and the chain was wrapped tightly around the cabinet handles. Neither Stanish[, the second officer], nor Liebich observed the contents of the cabinet prior to taking any action. . . . Stanish's action was to open the doors further, which the trial court correctly determined was a search. Liebich's action was to use his flashlight and an angled view through a small gap in an otherwise closed and locked cabinet. There was also no evidence that the gas leak was potentially coming from the locked cabinet. Thus, Liebich was not looking for a gas leak in the cabinet, nor was the cabinet proximate to the stove so that the use of a flashlight to illuminate behind the stove would have illuminated the interior of the cabinet. There was no testimony that the flashlight in this case was necessary to investigate the gas leak. Rather, the officer saw an admittedly suspicious cabinet, locked with a chain, and used his flashlight to try to see in through a small gap. Liebich's resulting view, with the aid of the flashlight, was embellished and not plain. Based on those facts, we find that defendant manifested a subjective expectation of privacy from observations of the contents of the cabinet. Defendant's expectation that the contents of the cabinet were protected from observation was reasonable. Liebich's actions amounted to a focused intrusion outside of the circumstances that authorized his presence.

270 N.E.3d at 347–48 (cleaned up).

As in **Hagestedt**, the officer in **Tarantino** had to perform additional actions beyond activating his flashlight in order to see through an otherwise solid object:

Detective Baker confronted a nearly solid wall when he entered defendant's porch. Boarded windows and nailed doors prohibited observation of the inside from all but the most rigorous scrutiny. To make his observations, Detective Baker had to bend and peer with a flashlight through quarter-inch cracks near the floor. . . .

> Far from demanding Detective Baker to avert his eyes to avoid viewing the building's interior, the cracks near the porch floor required him to make a probing examination in order to see inside. Under these circumstances defendant's reasonable expectation of privacy remained intact.

*Tarantino*, 368 S.E.2d at 592 (footnote omitted).

The facts of the instant case simply are not analogous to the padlocked cabinet or boarded-up windows and doors in the cases cited by the Majority. In fact, they are more akin to the hypothetical padlocked but glass-paned cabinet that *Hagestedt* distinguished from the solid cabinet door present in that case. Trooper Adams encountered a shoebox that had a hole on the upper edge of the box facing him. Appellant had not attempted to cover that hole or otherwise obscure from exterior eyes what was directly beneath. Furthermore, Trooper Adams did not crouch down, crane his neck, or otherwise reposition himself to inspect every corner of the inside of the shoebox with the aid of a flashlight. He simply illuminated his flashlight and looked down at the side of the box facing him from where he stood. Upon doing so, the trooper could clearly and immediately see obviously illegal contraband through the hole. In other words, he did not have "to make a probing examination in order to see inside" the shoebox. *Tarantino*, 368 S.E.2d at 592. I cannot conclude that activating a flashlight and looking at what was already facing him amounts to employing the "most rigorous scrutiny." *Id*.

In sum, when Trooper Adams was performing a community caretaking function, he was not required to avert his gaze from incriminating evidence

that could be seen from his legal vantage point with the mere aid of a flashlight. The fact that the capsules were visible through the hole placed them in plain view because the container did not conceal those particular contents from visibility, and he did not need to perform a search so as to be able to discover them. Having observed the contraband in plain view, the trooper was authorized to open the shoebox pursuant to the plain view doctrine to seize the narcotics. In doing so, he then observed in plain view the large amount of money kept with the drugs, and that was therefore also subject to seizure for the same reasons.

Accordingly, I conclude that the trial court did not err in denying Appellant's motion to suppress and would therefore affirm his judgment of sentence.

Judge Nichols and Judge McLaughlin join the dissenting opinion.